AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| | ) Case No. |
| Jocelyn Jeanette Mota-Alcazar | ) 6:22-mj-1273 |
| | ) |
| | ) |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __March 29, 2022__ in the county of __Orange__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute Fentanyl |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

ALEJANDRO CORONADO  SPECIAL AGENT
_Printed name and title_

Sworn to before me via Zoom and/or telephone conference and signed by me pursuant to Fed. R. Crim. P.4.1 and 41(d)(3).

Date: 03/30/2022

_Judge's signature_

City and state: Orlando, Florida

EMBRY J. KIDD, U.S. Magistrate Judge
_Printed name and title_

STATE OF FLORIDA

COUNTY OF ORANGE

Case No. 6:22-mj- 1273

## AFFIDAVIT

I, Alejandro C. Coronado, Special Agent ("SA") of the United States Drug Enforcement Administration ("DEA"), from the Orlando District Office, being duly sworn, do depose and state the following.

### Introduction

1. I make this affidavit in support of a criminal complaint for Jocelyn Jeanette Mota Alcazar (MOTA-ALCAZAR). Based on the following facts, there is probable cause to believe that MOTA-ALCAZAR has committed violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), specifically, on or about March 29, 2022, possessing with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] procainamide, i.e. fentanyl, a Schedule II controlled substance.

2. The information set forth in this affidavit is based upon my own personal knowledge as well as information provided to me by other law enforcement officers and additional sources, identified in this affidavit and is provided solely for the purpose of establishing probable cause in support of the requested search warrant. Because this affidavit is submitted for the limited purpose of establishing such probable cause, it does not include all of the details of this investigation of which I am aware.

## Agent Background

3.  I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") assigned to the Orlando District Office since April of 2021. I am a criminal investigator or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516(1).

4.  I have participated in, and conducted investigations of, violations of various state and federal criminal laws, including unlawful possession with intent to distribute controlled substances, distribution of controlled substances, use of communication facilities to commit narcotics offenses, fugitive apprehension, all in violation of federal law. Those investigations have resulted in the arrests of individuals who have conspired, smuggled, received, and distributed controlled substances, including but not limited to: cocaine, fentanyl, and methamphetamine.

5.  I have assisted in executing arrest warrants for fugitives who were co-conspirators within drug trafficking organizations (DTO) and have conducted surveillance in connection with such investigations.

6.  I have debriefed and directed confidential sources ("CSs"), and sources of information regarding narcotics investigations and the investigation of various crimes that arise from drug trafficking activities. I have directed CSs to successfully infiltrate narcotics enterprises by way of intelligence gathering and monitored purchases of controlled substances.

7. I am familiar with the ways in which narcotics traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of telephones to facilitate their illegal acts, and the use of codes to conduct drug transactions.

8. I have been employed by the DEA since August 2020 shortly before I attended the DEA Training Academy in Quantico, VA. Following graduation as a Special Agent from the DEA Academy, I have worked on assignments in the Ft. Myers, FL Resident office and the Orlando District Office in the Miami Field Division. Prior to my employment with DEA, I was a police officer in the state of Florida from 2019 to August 2020. I attended the Suncoast Criminal Justice Academy, and the Sarasota Police Department Recruit Officer Academy collectively from July 2019 to February 2020.

9. My training and experience as a Special Agent of the DEA, my conversations with other Special Agents and Task Force Agents/Officers ("TFAs"or "TFOs") of the DEA, and state and local investigators familiar with narcotics trafficking and money laundering matters, form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein.

10. The facts contained in this affidavit are based on my own personal knowledge, as well as DEA records, government records, and/or information relayed to me by other federal, state, and local law enforcement personnel.

11. I believe that the information and facts set forth in this affidavit establish probable cause to support the issuance of a federal criminal complaint for MOTA-

ALCAZAR. Throughout this case, I and my fellow agents have acquired evidence of a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

## PROBABLE CAUSE

12.  Based on law enforcement techniques and methods, the DEA was able to determine that there was likely going to be the purchase of illegal narcotics taking place in the vicinity of W. Orange Blossom Trial and Errol Pkwy, Apopka FL. on March 29, 2022. The DEA also used a confidential source (CS) who cooperated with law enforcement in the assistance of this investigation. The CS has been used in previous cases and the information the CS has provided has been found to be credible. The CS has cooperated in an effort to obtain sentencing credit in a case involving the CS. The address where the narcotics for sale were being stored was in 8061 Stone Rd. Apopka, Florida, which is a multi-family residence.

13.  The narcotics sale was for four kilograms of fentanyl for approximately $70,000.00 of U.S. currency. The sale was to take place on March 29, 2022, at approximately 10:45 a.m. The seller of the narcotics was to be driving a Ford Explorer SUV (vehicle), white in color.

14.  In the morning of March 29, 2022, the DEA began surveilling the house located at 8061 Stone Rd. Apopka, FL. Agents observed the white vehicle parked in front of the residence. At approximately 10:30 a.m., the white vehicle was observed leaving the residence and traveling in the direction of the meet location where the drug transaction was to take place.

15. The vehicle was followed and pulled over at approximately 10:40 a.m. while traveling west bound on W. Orange Blossom Trail. The vehicle was bearing FL tag "PCTD59." The white vehicle was pulled over by a uniformed Apopka police officer for exceeding the speed limit. The uniformed officer asked the driver for a driver's license and the female subject was identified as MOTA-ALCAZAR. An Apopka canine unit was in the vicinity of the traffic stop and arrived on scene at approximately 10:50 a.m. The canine officer ran the drug-sniffing canine around the vehicle and the canine alerted indicating a positive presence of narcotics in the rear of the vehicle. At approximately 11:00 a.m., Apopka police officers began searching the white vehicle and located a medium sized child's backpack (blue in color) in the trunk area of the white vehicle.

16. Inside of the backpack was a large white trash bag containing a brown cardboard box. Inside of the cardboard box was a large clear plastic bag containing four individual "bricks." In my training and experience, a "brick" is typically one kilogram of narcotics equivalent to 2.21 lbs. of a pressed white powdery substance. In my training and experience, the substance was consistent with the appearance of fentanyl. Two of the "bricks" were in sealed transparent plastic food-saver type packaging. The two other "bricks" were also in the same sealed plastic packaging and they were wrapped in duct tape. The white powdery substance, consistent with the appearance of fentanyl was visible through the packaging. When Apopka officer's asked MOTA-ALCAZAR about the suspected fentanyl inside of the backpack, MOTA-ALCAZAR, initially, denied knowledge of it. An Apopka officer asked her to

exit her vehicle. MOTA-ALCAZAR exited her vehicle and retrieved her infant son. Her infant son was the only other occupant of the white vehicle sitting in a car seat in the second row.

17. While standing outside of the vehicle, an Apopka police officer once again asked MOTA-ALCAZAR about the backpack containing large amounts of suspected fentanyl. At this point, MOTA-ALCAZAR stated that she was asked to pick up the narcotics and bring them to the meet location for a sale.

18. At approximately 11:30 a.m., I and another police officer transported MOTA-ALCAZAR and her child to the Apopka Police Department. At the police department, I read MOTA-ALCAZAR her Miranda Rights in Spanish, which was video-recorded. MOTA-ALCAZAR indicated she understood her Miranda rights and that she would like to speak with me.

19. The interview was conducted in both Spanish and English. MOTA-ALCAZAR admitted to picking up the package from a male, but she was unaware of the male's identity. She admitted that she suspected the package contained drugs. MOTA-ALCAZAR also stated that she was "afraid" of the package and hid it in her bedroom closet under some blankets where the package remained for an entire week prior to March 29. MOTA-ALCAZAR stated that she was to meet another unknown male on the morning of March 29, 2022, in Apopka, Florida, to exchange the drugs for money. MOTA-ALCAZAR stated that the male would be purchasing the drugs for approximately $70,000.00 in exchange for the package of fentanyl. MOTA-ALCAZAR stated that she was to receive $2,000.00 for conducting the sale.

20. During the interview of MOTA-ALCAZAR, other Apopka police officers conducted a field test on one of the packages of suspected fentanyl. The field test produced positive results for fentanyl. The fentanyl "bricks" have not yet been weighed, but due my knowledge, through training and experience, of about how much a "brick" of fentanyl weighs and the evidence that the anticipated drug deal involved four kilograms of fentanyl for $70,000, I know that the amount of fentanyl is well over 400 grams. In my training and experience over 400 grams of fentanyl is an amount of drugs that is intended for distribution because it far exceeds a personal use amount of the narcotic. All drug evidence will be processed and shipped to the DEA Southeast Laboratory for further testing.

## CONCLUSION

21. Based on the foregoing facts and opinions, my experience and training, and consultation with other law enforcement agents experienced in drug investigations, I believe that there is probable cause to believe that on or about February 26, 2021, MOTA-ALCAZAR committed violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), specifically, possession with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] procainamide, i.e. fentanyl, a Schedule II controlled substance.

Respectfully submitted,

SA Alejandro Coronado
Drug Enforcement Administration

Affidavit submitted by email and attested to me as true and accurate by Zoom and/or teleconference conference consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this 30th day of March, 2022.

THE HONORABLE EMBRY J. KIDD
United States Magistrate Judge